**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

MIKEL L. PEUGH,           )
                          )
         **Plaintiff,**      )
                          )
vs.                    )       **Case No. 14-cv-338-CVE-TLW**
                          )
CAROLYN W. COLVIN,      )
**Acting Commissioner of Social Security,**  )
                          )
         **Defendant.**     )

## REPORT AND RECOMMENDATION

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Plaintiff Mikel L. Peugh seeks judicial review of the Commissioner of the Social Security Administration's decision finding that he is not disabled. As set forth below, the undersigned recommends that the Commissioner's decision denying benefits be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART**.

## INTRODUCTION

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423 (d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). "Disabled" is defined under the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of his alleged disability. 20 C.F.R. §§ 404.1512(b), 416.912(b). A disability is a physical or mental impairment "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically

acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423 (d)(3). "A physical impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. The evidence must come from "acceptable medical sources," such as licensed and certified psychologists and licensed physicians. 20 C.F.R. §§ 404.1513(a), 416.913(a). A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." Williams, 844 F.2d at 750.

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. See Grogan v. Barnhart, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. See id. The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." Id. The Court may neither re-weigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395

F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## BACKGROUND

Plaintiff, then a 35-year old male, applied for Title II benefits on April 25, 2011, and Title XVI benefits on May 4, 2011, alleging a disability onset date of October 16, 2010, for purposes of his Title II application. (R. 142-43, 144-49). Plaintiff claimed that he was unable to work due to mild mental retardation, PTSD, hallucination, anxiety, ADD, and dyslexia. (R. 174). Plaintiff's claims for benefits were denied initially on July 7, 2011, and on reconsideration on October 10, 2011. (R. 57-71). Plaintiff then requested a hearing before an administrative law judge ("ALJ"), and the ALJ held the hearing on September 26, 2012. (R.31-56). The ALJ issued a decision on October 22, 2012, denying benefits and finding plaintiff not disabled. (R. 9-30). The Appeals Council denied review, and plaintiff appealed. (R. 1-3, Dkt. 2).

### The ALJ's Decision

The ALJ found that plaintiff is insured through December 31, 2014, and has not performed any substantial gainful activity since October 16, 2010, his alleged disability onset date. (R. 15). Plaintiff's part-time work as a cook between April and September 2011 (after his alleged disability onset date) does not rise to the level of substantial gainful activity. (R. 15-16). The ALJ found that plaintiff has severe impairments of "learning disorder, anxiety disorder, posttraumatic stress disorder, and schizoaffective disorder." (R. 16). The ALJ considered Listings 12.02, 12.03, and 12.06 and determined that plaintiff does not meet or medically equal a listing. Id. In assessing the severity of plaintiff's mental impairments, the ALJ also considered the "paragraph B" criteria, finding that plaintiff has mild limitations in activities of daily living

and moderate limitations in social functioning and in concentration, persistence, or pace. (R. 16-17).

The ALJ then reviewed plaintiff's testimony and the medical evidence. Plaintiff testified that he uses city buses for transportation because he has never had a driver's license. (R. 18). He sometimes becomes confused when taking the bus and states that his dyslexia causes the words on the bus schedule to appear "jumbled." (R. 19). His girlfriend or the bus driver helps him choose bus routes. Id.

Plaintiff currently works twenty hours a week as a cashier and cook. Id. Plaintiff testified that he was offered a full-time position but did not accept it because his job makes him feel stressed, confused, and forgetful of his job duties at times. Id. He stated that he sometimes forgets the amount of food to cook and cannot make change without the cash register. Id. Plaintiff also collected unemployment benefits until January 2012. Id. Plaintiff stated that "he was told" he could apply for unemployment benefits, work part-time, and apply for disability benefits. Id.

Plaintiff has a history of marijuana and methamphetamine use, but he stated that he stopped using drugs three years ago. Id. He currently takes Zoloft, Risperdal, and Trazadone as prescribed, with no side effects. Id.

Plaintiff lives with his girlfriend, her three children, and their two-year-old daughter. (R. 18-19). He can shop for groceries as long as someone is on the phone with him dictating a list of items. (R. 19). He does household chores. Id. He needs reminders to take his medication and to get ready for work. Id. Plaintiff also testified that he has difficulty focusing, even when engaging in his hobby of playing video games. Id. Plaintiff does not socialize. Id.

Plaintiff sought treatment from Associated Centers for Therapy ("ACT") in January 2011, complaining of anxiety and poor thought processes. (R. 20). He reported that he last used methamphetamine a few weeks earlier. Id. Plaintiff was prescribed Zoloft and Mirtazapine. Id. At his second appointment in May 2011, plaintiff reported that he "'felt great' and had no complaints." (R. 21). In August 2011, plaintiff reported that "he was 'doing well'" and that "[h]is symptoms were under good control." Id.

In June 2011, plaintiff underwent a consultative psychological examination with Dr. Minor Gordon. (R. 20). Plaintiff reported that he had attended two therapy sessions at ACT. Id. Plaintiff gave Dr. Gordon multiple accounts regarding his history of drug use, and Dr. Gordon noted that plaintiff's reports during the examination conflicted with his previous reports to ACT. Id. Dr. Gordon also noted that ACT diagnosed plaintiff with posttraumatic stress disorder and schizoaffective disorder. Id.

Dr. Gordon found that plaintiff was alert and attentive with a calm affect and good eye contact. Id. Dr. Gordon estimated that plaintiff's cognitive processing was low average, which would impact his "judgment in a work situation depending on the complexity of task." Id. His memory was adequate. Id. He diagnosed plaintiff as a malingerer, based on plaintiff's multiple inconsistent reports of past drug use, and noted that he could not rule out current substance abuse. (R. 21). He opined that plaintiff "has the ability to perform some type of routine and repetitive task on a regular basis as well as to relate adequately with coworkers and supervisors on a superficial level for work purposes." Id.

Dr. Corine Samwel, an agency psychologist, reviewed plaintiff's records in October 2011 and completed a mental residual functional capacity assessment. Id. She opined that plaintiff "could understand, retain and carry out simple instructions." Id. Plaintiff had some limitations in

concentration "but should be able to complete simple tasks for 6-8 hours in an eight hour period." Id. She also opined that plaintiff could work under normal supervision and "cooperate effectively with public and co-workers in completing simple tasks and transactions." Id.

In September 2012, a licensed professional counselor ("LPC") completed a mental status form "under the instruction of Dr. Chris Blaisdeli [sic]." Id. The form states that plaintiff is "a literal thinker" who misunderstood questions during the assessment. Id. Plaintiff was "intensely focused" during sessions but did not participate in group therapy. Id. During sessions, his memory was adequate, but plaintiff reported short-term and long-term memory problems that prevented him from performing complex tasks. Id. Plaintiff also reported problems with anxiety and depression. Id.

The ALJ gave great weight to the opinions of Drs. Gordon and Samwel, both of whom found that plaintiff could perform routine work and handle superficial interactions with co-workers. (R. 23). The ALJ found that these opinions "are consistent with and supported by the medical evidence in this case." Id. The ALJ noted that he was incorporating both opinions into his residual functional capacity findings. Id.

The ALJ gave little weight to the mental status form completed by the LPC. Id. The ALJ found that the "opinion appears to be based upon the claimant's subjective complains [sic] only." Id. The ALJ also noted that the LPC was not an acceptable medical source, so the ALJ rejected the mental status form as "opinion evidence."

In assessing plaintiff's credibility, the ALJ relied heavily on plaintiff's multiple, inconsistent reports regarding his history of drug abuse. (R. 22). The ALJ also relied on inconsistencies between plaintiff's testimony that he has difficulty focusing and his reports to ACT that he was "doing well" and feeling "great." Id. The ALJ noted that plaintiff was able to

play video games as a hobby, an activity inconsistent with his claims that he has difficulty concentrating. Id. Additionally, the ALJ found that plaintiff's work history did not support a finding of credibility, particularly the fact that plaintiff worked part-time while collecting unemployment benefits and applying for Social Security disability. Id. The ALJ pointed out that eligibility for unemployment benefits required plaintiff to assert an ability and willingness to work full-time while eligibility for Social Security benefits required plaintiff to assert an inability to work. Id.

The ALJ then weighed and rejected the third-party function report completed by plaintiff's girlfriend. (R. 23). He found the girlfriend's report "not completely truthful" because she stated that plaintiff, who was working as a cashier, could not count change." Id. He also rejected her opinion because she was not a medical source and because she had a financial stake in the outcome of the case. Id.

The ALJ concluded that plaintiff retained the residual functional capacity to "perform a full range of light and sedentary work, except no climbing of ladders, scaffolds, unprotected heights, and dangerous machinery parts." (R. 17). Plaintiff was also limited to simple instructions and was "able to interact with coworkers and supervisors with routine supervision."[1] Id. The ALJ found that plaintiff could not perform his past relevant work but could perform other work. (R. 23-25). Accordingly, the ALJ found that plaintiff was not disabled. (R. 25-26).

**Plaintiff's Medical Records**

On appeal, plaintiff raises two issues related to the ALJ's consideration of the medical evidence. The undersigned has reviewed the records and included a discussion of those documents below. Otherwise, the ALJ's decision adequately addresses the medical evidence.

---

[1] The ALJ's residual functional capacity findings are a mishmash of plaintiff's case and an unrelated case. (R. 17). Despite the poor drafting and editing of the ALJ's decision, the undersigned is able to follow the ALJ's findings and reasoning.

In October 2011, agency psychologist Dr. Samwel completed a Mental Residual Functional Capacity Assessment and Psychiatric Review Technique form. (R. 298-315). Dr. Samwel opined that plaintiff has mild limitations in activities of daily living and moderate limitations in social functioning and in concentration, persistence, or pace. (R. 312). In the Mental Residual Functional Capacity Assessment, Dr. Samwel opined that plaintiff was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods of time, work near other co-workers without becoming distracted, and perform at a consistent pace. (R. 298-99). In the "Remarks" section of the form, Dr. Samwel stated that plaintiff "should be able to complete simple tasks for 6-8 hours in an eight-hour period at and appropriate pace, and sustain this level across days and weeks." (R. 300).

Dr. Samwel also opined that plaintiff has a moderate limitation in his "ability to interact appropriately with the general public" and that he "[m]ay show limited tolerance for frequent, recurrent contact with the general public." Id. As a result of this limitation, she opined that plaintiff "[w]ill function best at tasks with modest social demands." Id. However, in her summary of plaintiff's residual functional capacity, Dr. Samwel stated that plaintiff "can cooperate effectively with public and co-workers in completing simple tasks and transactions." Id.

In September 2012, an LPC at ACT completed a Mental Status Form and Mental Residual Functional Capacity Form. (R. 324-27). The form, completed in the LPC's handwriting, addresses plaintiff's treatment history and progress at ACT and is signed by both the LPC and Dr. Blaisdell, one of plaintiff's treating physicians at ACT. Id.

The Mental Status Form contains statements reflecting plaintiff's own reports to the LPC and other staff, observations of plaintiff's behavior at the time of the initial assessment and during the course of his therapy sessions, and plaintiff's response to his medications. (R. 324-25). When read in conjunction with the treatment notes, the statements in the Mental Status Form can be clearly categorized, leaving no confusion about which statements qualify as opinions from the treating physician, the LPC, and plaintiff.

The Mental Residual Functional Capacity Form rates limitations as follows: "No Significant Limitation," "Moderate Limitation," Marked Limitation," "Severe Limitation," and "Insufficient Evidence." (R. 326-27). The form indicates that plaintiff has a number of marked and severe limitations, particularly with respect to detailed instructions, concentration, and social interaction with co-workers and supervisors. Id. In several places, the form notes that the limitation is based on plaintiff's self-reporting; however, the form does not clearly identify the basis for all of the limitations imposed. Id. This form, like the Mental Status Form, was completed by the LPC but contains both the LPC and treating physician's signatures. Id.

## ANALYSIS

On appeal, plaintiff raises three points of error: (1) whether the ALJ adequately considered the medical opinion evidence; (2) whether the ALJ erred at steps three through five by failing to find that plaintiff met the requirements of Listing 12.03 or by failing to include all of plaintiff's limitations in the residual functional capacity findings and hypothetical to the vocational expert; and (3) whether the ALJ conducted a proper credibility analysis.

### Medical Opinion Evidence

Plaintiff argues that the ALJ failed to properly evaluate the Mental Status Form and Mental Residual Functional Capacity Form completed by the LPC and signed by plaintiff's

treating physician, Dr. Blaisdell. (Dkt. 17). Alternatively, plaintiff argues that the ALJ should have evaluated the opinion under SSR 06-03p if he believed that the LPC rendered the opinion. Id. Plaintiff also argues that the ALJ erred in evaluating the opinions of Drs. Gordon and Samwel. Id. Plaintiff contends that the opinions are inconsistent with the treating physician's opinion and with each other. Id. Plaintiff also contends that Dr. Samwel's opinion that plaintiff could only concentrate for six to eight hours is not consistent with a finding that plaintiff can perform other work. Id.

The Commissioner argues that the ALJ properly evaluated the Mental Status Form and Mental Residual Functional Capacity Form, regardless of whether the ALJ was required to evaluate the opinions as treating physician's opinions or other sources under SSR 06-03p. (Dkt. 21) The Commissioner contends that the ALJ rejected the opinions because they were not consistent with the medical evidence and because they relied heavily on plaintiff's subjective complaints. Id. Similarly, the Commissioner argues that the ALJ properly relied on the opinions of Drs. Gordon and Samwel because their opinions were consistent with the objective medical evidence. Id.

**Treating Physician's Signature on Forms**

Ordinarily, a treating physician's opinion is entitled to controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); see also Hackett v. Barnhart, 395 F.3d at 1173-74 (citing Watkins v. Barnhart, 350 F.3d 1297, 1300-01 (10th Cir. 2003)). If the ALJ discounts or rejects a treating physician opinion, he is required to explain his reasoning for so doing. See Frey v. Bowen, 816 F.2d 508, 513 (10th Cir. 1987) (stating that an ALJ must give specific, legitimate reasons for

disregarding a treating physician's opinion); <u>Thomas v. Barnhart</u>, 147 F.App'x 755, 760 (10th Cir. 2005) (holding that an ALJ must give "adequate reasons" for rejecting an examining physician's opinion and adopting a non-examining physician's opinion).

The analysis of a treating physician's opinion is sequential. First, the ALJ must determine whether the opinion qualifies for "controlling weight," by determining whether it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and whether it is consistent with the other substantial evidence in the administrative record. <u>Watkins</u>, 350 F.3d at 1300. If the answer is "no" to the first part of the inquiry, then the analysis is complete. If the ALJ finds that the opinion is well-supported, he must then confirm that the opinion is consistent with other substantial evidence in the record. <u>Id.</u> "[I]f the opinion is deficient in either of these respects, then it is not entitled to controlling weight." <u>Id.</u>

However, even if the ALJ finds the treating physician's opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the record, treating physician opinions are still entitled to deference and must be evaluated in reference to the factors enumerated in 20 C.F.R. §§ 404.1527 and 416.927. Those factors are as follows:

> (1) the length of the treating relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed, (3) the degree to which the physician's opinion is supported by relevant evidence, (4) consistency between the opinion and the record as a whole, (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.

<u>Watkins</u>, 350 F.3d at 1301 (citing <u>Drapeau v. Massanari</u>, 255 F.3d 1211, 1213 (10th Cir. 2001)). The ALJ must give good reasons in his decision for the weight he ultimately assigns the opinion. <u>Id.</u> (citing 20 C.F.R. § 404.1527(d)(2)). The reasons must be of sufficient specificity to make

clear to any subsequent reviewers the weight the adjudicator gave to the treating physician's opinion and the reasons for that weight. See Anderson v. Astrue, 319 F.App'x 712, 717 (10th Cir. 2009) (unpublished)[2].

In McGoffin v. Barnhart, 288 F.3d 1248, 1252 (10th Cir. 2002), the ALJ refused to give any weight to an opinion bearing the treating physician's signature, in part because "the ALJ expressed doubt that the assessment was actually that of [the treating physician]." The ALJ made this finding despite "the undisputed testimony of another member of the treatment team" that the treating physician "reviewed and agreed with the assessment." Id. The Tenth Circuit remanded the case for proper consideration of the treating physician's opinion, stating that the ALJ erred in questioning the treating physician's authorship of the opinion. See id.

In this case, the ALJ refused to evaluate the Mental Status Form and Mental Residual Functional Capacity Form signed by Dr. Blaisdell as opinion evidence. (R. 23). The ALJ acknowledged that the LPC completed the forms "under the instruction of" the treating physician but found that the forms were actually the opinion of the LPC who completed them. (R. 21, 23). Rather than weighing these opinions as the opinions of a treating physician, the ALJ speculated that Dr. Blaisdell did not share the opinions expressed in the forms, despite the appearance of his signature on both. McGoffin prohibits this sort of speculation and requires the ALJ to weigh the opinion. See id. at 1252-53. For this reason, the undersigned recommends that the District Court remand the case to allow the ALJ to conduct a proper treating physician's analysis of the Mental Status Form and the Mental Residual Functional Capacity Form. While the ALJ may find, as the Commissioner argues, that the opinions are not supported by the objective medical evidence, it is the ALJ's duty, and not the Court's, to make that determination.

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

McGoffin also held that, "if the ALJ believed the matter [of authorship of the opinion] was open to question, he had an obligation under the applicable regulations to obtain additional information from [the treating physician] before rejecting the report outright." Id. at 1252 (citing 20 C.F.R. § 404.1512(e)(1)). Since McGoffin was decided, however, the regulations have been amended to allow the ALJ more flexibility in contacting medical sources. The applicable regulations now state that the ALJ may "determine the best way to resolve [an] inconsistency or insufficiency" in medical opinion evidence. 20 C.F.R. §§ 404.1520b(c), 416.920b(c). Contacting the medical source is one option, but it is no longer required. See 20 C.F.R. §§ 404.1520b(c)(1)-(4), 416.920b(c)(1)-(4).

**Opinions of Dr. Gordon and Dr. Samwel**

Plaintiff argues that the ALJ erred in giving great weight to the opinions of Dr. Gordon and Dr. Samwel because they are inconsistent with the treating physician's opinion. (Dkt. 17). Plaintiff also argues that, despite giving great weight to Dr. Samwel's opinion, the ALJ did not adopt the limitation that plaintiff could only perform tasks at a proper pace for six hours in an eight-hour day. Id. Plaintiff contends that, if Dr. Samwel's opinion was given great weight, the ALJ should have included an additional limitation on plaintiff's concentration, a limitation that results in finding plaintiff disabled. Id.

Because the undersigned has recommended that the District Court remand the case for the ALJ to consider the treating physician's opinion, the ALJ would need to consider whether the opinions of Dr. Gordon and Dr. Samwel are consistent with the treating physician's opinion. However, the undersigned has also considered the merit of plaintiff's other arguments regarding these medical source opinions.

Regarding Dr. Samwel's opinion, plaintiff's reliance on the limits to plaintiff's concentration is misplaced. Dr. Samwel opined that, even with his limitations, plaintiff would be able to concentrate well enough "to complete simple tasks for 6-8 hours in an eight-hour period at an appropriate pace, and sustain this level across days and weeks." (R. 300). Dr. Samwel's ultimate opinion was that plaintiff retained the residual functional capacity to perform simple, routine tasks on a sustained basis. Id. Plaintiff presented this limitation to the vocational expert, who stated that a limitation on concentration for "six to eight hours" did not necessarily preclude plaintiff from performing other work. (R. 53-54). The vocational expert stated, "So, it's hard to say. Some of the jobs, he might be able to do; some of them, he may not. Some of the fast-paced jobs, I think, might be a problem. He'd have to pretty much be on task all the time." Id. If, however, plaintiff was only able to concentrate for six hours in a day, the limitation would prevent plaintiff from working. (R. 54).

Based on Dr. Samwel's opinion, considered in its entirety, and the vocational expert's testimony, the undersigned finds that the ALJ did not err in failing to include an additional limitation on plaintiff's concentration. While the ALJ could have discussed Dr. Samwel's opinion regarding the limits on plaintiff's concentration, the undersigned is able to follow the ALJ's reasoning and does not insist on "technical perfection." Keyes-Zachary v. Astrue, 695 F.3d 1156, 1166 (10th Cir. 2012). The Tenth Circuit has held that the reviewing courts, "should, indeed must, exercise common sense." Id. The ALJ's finding limiting plaintiff to simple, routine tasks is sufficient to satisfy the undersigned that the ALJ properly included all of Dr. Samwel's limitations in his residual functional capacity assessment.

**Steps Three through Five**

Plaintiff argues that the ALJ erred at steps three through five by failing to find (1) that plaintiff met the requirements of Listing 12.03; (2) that the ALJ made a number of factual mistakes in the residual functional capacity analysis that undermine his findings; and (3) that the ALJ's hypothetical to the vocational expert should have included a limitation on plaintiff's interaction with the public, based on the ALJ's decision to give great weight to Dr. Samwel's opinion. (Dkt. 17).

The Commissioner argues that plaintiff does not meet the requirements of Listing 12.03 because the ALJ found that plaintiff did not have marked limitations in considering the "paragraph B" criteria. (Dkt. 21). The Commissioner also argues that plaintiff misinterprets Dr. Samwel's opinion and that Dr. Samwel did not opine that plaintiff had a functional limitation with respect to public interaction. Id.

**Listing 12.03**

Listing 12.03 describes "Schizophrenic, Paranoid and Other Psychotic Disorders." In this case, in order to meet the listing, plaintiff must establish that his medical records document symptoms associated with such disorders, including "[d]elusions or hallucinations," *and* marked limitations in at least one of the "paragraph B" categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.03 A and B. Plaintiff argues that the medical records clearly establish the necessary symptoms and that Dr. Blaisdell's opinion establishes the marked limitations in social functioning and in concentration, persistence, or pace. (Dkt. 17). The Commissioner argues that the ALJ found that plaintiff had only mild and moderate limitations in the "paragraph B" categories; therefore, plaintiff cannot meet the requirements for the listing. (Dkt. 21).

Plaintiff challenges the ALJ's findings by arguing that the ALJ should have incorporated the findings of Dr. Blaisdell at step three. The undersigned has addressed the issue of Dr. Blaisdell's opinion, *supra*, and has recommended that the District Court remand for the ALJ to conduct a proper treating physician's opinion. If, on remand, the ALJ determines that Dr. Blaisdell's opinion is entitled to some weight, the ALJ would then reconsider his findings at step three. However, as the ALJ's findings currently stand, the undersigned finds that plaintiff cannot establish that he meets the requirements of Listing 12.03. For this reason, the undersigned recommends a finding of no error on this issue.

### Factual Mistakes in the Residual Functional Capacity Analysis

Plaintiff argues that the ALJ included a number of factual mistakes in his residual functional capacity findings that "further indicate a lack of proper consideration of all the evidence and lack of understanding of the case." (Dkt. 17). Specifically, plaintiff contends that the ALJ cited the wrong claimant name, birthdate, and educational history and that the ALJ referred to plaintiff, a male, as "she" and "her." Id. The Commissioner argues that the ALJ's drafting errors do not support plaintiff's claims and that the ALJ, in his explanation of his findings, cites the correct evidence. (Dkt. 21).

In the discussion of the ALJ's decision, *supra*, the undersigned noted that the ALJ's residual functional capacity findings were poorly drafted. After reviewing the ALJ's decision as a whole, however, the undersigned finds that the ALJ's errors are simply scrivener's errors that do not impact the outcome of the case. See Poppa v. Astrue, 569 F.3d 1167, 1172 n. 5 (10th Cir. 2009). In other portions of the decision, the ALJ does correctly identify plaintiff, his birthdate, and his educational history. It is clear to the undersigned that the ALJ's decision is poorly edited. Nonetheless, the undersigned recommends a finding of no error on this issue.

**Hypothetical**

Plaintiff argues that the ALJ should have included a limitation on plaintiff's ability to interact with the public because Dr. Samwel included a limitation in her opinion, and the ALJ gave great weight to her opinion. (Dkt. 17). The Commissioner argues that Dr. Samwel noted that plaintiff may have some difficulty interacting with the public but ultimately concluded that the difficulty was not so great that plaintiff's interaction with the public should be limited. (Dkt. 21). The undersigned notes that plaintiff's argument is not a step five argument, but a step four argument because plaintiff is essentially arguing that the ALJ failed to include a limitation on public interaction in his residual functional capacity findings.

In the Mental Residual Functional Capacity Form, Dr. Samwel opined, by checking a box on the form, that plaintiff has a moderate limit in his "ability to interact appropriately with the general public." (R. 299). In her narrative, however, Dr. Samwel explained that plaintiff "[m]ay show limited tolerance for frequent, recurrent contact with the general public" and "[w]ill function best at tasks with modest social demands." (R. 300). Dr. Samwel's final opinion was that plaintiff "can cooperate effectively with public and co-workers in completing simple tasks and transactions." Id. Accordingly, the undersigned finds that Dr. Samwel did not intend to impose a limitation on plaintiff's ability to interact with the public as long as plaintiff was restricted to simple tasks. The ALJ did limit plaintiff to simple, routine tasks, so the ALJ's conclusions are consistent with Dr. Samwel's opinion, which was given great weight. (R. 17, 23). Accordingly, the undersigned recommends a finding of no error on this issue.

**Credibility**

Plaintiff argues that the ALJ's failure to properly consider the medical evidence also impacted the ALJ's credibility findings. (Dkt. 17). Plaintiff argues that the ALJ erred in finding

that plaintiff worked "only sporadically." Id. Plaintiff claims that he did work consistently from 2004 to 2010 but argues that his history of multiple, short-term jobs is consistent with his claims of severe mental impairment. Id. Plaintiff further claims that his part-time job is a positive credibility factor that shows a motivation to work. Id. Plaintiff also argues that the ALJ erred in finding that the collection of unemployment benefits weighed against his credibility. Id.

The Commissioner argues that the ALJ's credibility findings are supported by substantial evidence. (Dkt. 21). The Commissioner contends that the ALJ relied on the efficacy of plaintiff's treatment, the medical opinion evidence of malingering, the collection of unemployment benefits, plaintiff's activities of daily living, and his part-time work as proof that plaintiff's claims of disability were not credible. Id.

This Court will not disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (citing Diaz v. Secretary of Health & Human Svcs., 898 F.2d 774, 777 (10th Cir. 1990)). Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." Id. (citing Huston v. Bowen, 838 F.2d 1125, 1133 (10th Cir. 1988) (footnote omitted)). The ALJ may consider a number of factors in assessing a claimant's credibility, including "the levels of medication and their effectiveness, the extensiveness of the attempts . . . to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, . . . and the consistency or compatibility of nonmedical testimony with objective medical evidence." Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995).

In his credibility findings, the ALJ relied on plaintiff's multiple inconsistent reports regarding his history of substance abuse. (R. 22). The ALJ noted that plaintiff was "not entirely truthful," thereby reducing his credibility. Id. The ALJ also relied on plaintiff's treatment records, in which plaintiff reported that his medications were almost immediately effective in improving his symptoms. Id. These statements are inconsistent with plaintiff's claim that he was disabled due to his mental impairments. Id.

The ALJ was also entitled to rely on plaintiff's collection of unemployment benefits from 2010 through January 2012 as evidence that plaintiff's claim of disability was not credible. Id. As the Tenth Circuit recently explained, the ALJ is permitted to rely on a claimant's receipt of unemployment benefits as evidence of a lack of credibility because "[t]here is an obvious inconsistency between claiming an *ability* to work for purposes of obtaining unemployment compensation and claiming an *inability* to work for purposes of obtaining social security benefits." Pickup v. Colvin, 2015 WL 1515460, *2 (10th Cir. April 6, 2015) (unpublished). The ALJ also found that plaintiff's continued part-time employment was inconsistent with his claim that he was unable to work, further reducing his credibility. (R. 22).

These findings are all proper credibility considerations and are supported by substantial evidence. For this reason, the undersigned recommends a finding of no error on this issue.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's decision in this case be **REVERSED AND REMANDED IN PART and AFFIRMED IN PART.** On remand, the ALJ should evaluate the Mental Status Form and Mental Residual Functional Capacity Forms signed by Dr. Blaisdell as treating physician's opinions. The undersigned recommends affirming the ALJ's decision on all other points of error;

however, because the treating physician's analysis may impact the ALJ's previous findings regarding the other medical source evidence and plaintiff's residual functional capacity, the ALJ should be permitted to reconsider any related issues on remand.

## OBJECTION

In accordance with 28 U.S.C. §636(b) and Fed. R. Civ. P. 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma by June 26, 2015.

If specific written objections are timely filed, Fed. R. Civ. P. 72(b)(3) directs the district judge to determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions. See also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED this 12th day of June 2015.

T. Lane Wilson
United States Magistrate Judge